STEEL CONTAINERS, INC., A CORPORATION, APPELLANT, V. OMAHA PUBLIC POWER DISTRICT, A PUBLIC CORPORATION, APPELLEE.

251 N. W. 2d 669

Filed March 23, 1977. No. 40657.

John R. Barton of Crossman, Barton & Norris, for appellant.

Stephen G. Olson of Fraser, Stryker, Veach, Vaughn & Meusey, for appellee.

Heard before SPENCER, NEWTON, and BRODKEY, JJ., HASTINGS, District Judge, and KUNS, Retired District Judge.

HASTINGS, District Judge.

This is an action for damages brought against the defendant, Omaha Public Power District, a public corporation, for its alleged negligence in requiring electrical service to plaintiff's business of greater capacity than was later determined to be necessary. The case was tried to the court without a jury as is mandated by the Political Subdivisions Tort Claims Act, sections 23-2401 to 23-2420, R. R. S. 1943, and was dismissed for the reason "that the plaintiff has failed to produce any evidence of negligence on the part of the Omaha Public Power District which was the proximate cause of any of the plaintiff's damage."

In December of 1971, plaintiff corporation leased the Jadatom Building in the City of Omaha to install a pail factory. Part of the equipment moved into the building was a 250 KVA welding machine. This particular welder previously had been operated in Portland, Oregon, on one leg of a three phase electrical service of unknown capacity. A question arose in the mind of plaintiff's president as to the electrical service capacity at the Jadatom Building which was served by three 50 KVA transformers providing 480 volt three phase service, and defendant was called for advice. The only information considered by defendant's employees was the name plate rating on the welder itself and, from that information, it was determined that it would be necessary to isolate the welder onto a single phase line with additional transformer capacity. Because the cost of rewiring and the minimum monthly energy charge required by the defendant would make the contemplated operation economically unfeasible, the plaintiff rescinded the lease, made a settlement with the landlord, and moved the production equipment into its own building on North 11th Street. The same service requirements and minimum monthly energy charge were made by the defendant at that location to which plaintiff acceded.

Defendant steadfastly refused to consider the proposed use to be made of the welding machine by the plaintiff, which was claimed to be well below its name plate capacity, and refused or at least neglected to run any capacity tests with the welder hooked up to anything but the required single phase service. Its position was that it had not only an obligation to plaintiff, but to others of its customers who might be adversely affected by plaintiff's use of insufficient power capability as well as to itself in the safeguarding of its own equipment. This obligation, it insisted, was to provide facilities which would handle the maximum rated capacity of the welder

because there was no way that it could be guaranteed that the machine would not be used in that manner.

After several months of operation, plaintiff again complained about the high cost of its monthly minimum energy charge and requested the defendant to make a test of its power requirements as the plant was then being operated. Such a test was run and it was determined that the original three phase service in either the Jadatom Building or the North 11th Street Building would have handled the welder in the manner that it was then being utilized. Accordingly, the single phase service was removed and the monthly minimum energy charge discontinued. Plaintiff in this action seeks to recover its expenses in moving from the Jadatom Building, the cost of installing and removing the one phase service, and the difference between the minimum monthly charges paid and the charges for the actual energy used.

Plaintiff's witnesses would tend to prove that by assuming the gauge of metal to be welded and the speed at which it was to be welded, the kilowatt utilization or power requirements of the welder could be determined by employing various charts and engineering formulas without the necessity of actually hooking up the machine.

From the evidence adduced by defendant, the court could find that it was the plaintiff which had called in defendant to assure plaintiff that the power capacity was adequate; that if plaintiff had taken it on itself to assume the risk of hooking up and operating the welder on one leg of the existing three phase service and then had run its own test which showed it operated within the existing service capabilities, plaintiff would have been permitted to utilize the existing service. An electrical engineer for the contractor who originally wired the Jadatom Building and who was doing the wiring work for plaintiff in that building, testified that he would not recommend

connecting a 250 KVA welder to the existing service, and agreed with the single phase requirement. He also gave as his opinion that in dealing with electrical equipment and capacity requirements it is normal practice to abide by the name plate rating.

Personnel of the defendant company as well as the distribution engineer for the Board of Public Utilities of Kansas City, Kansas, testified that it is normal industry practice to provide service for the maximum name plate capacity of the equipment being used.

Defendant contends that it followed industry standards, and therefore was not negligent, suggesting that if it had provided facilities of insufficient power capacity and damage had occurred, it would have been liable.

Plaintiff insists that custom or standards of an industry cannot excuse the failure to use ordinary care under the particular circumstances. The problem with this position is that plaintiff suggests no definitive alternative standards. It cites Hiers v. South Carolina Power Co., 198 So. C. 280, 17 S. E. 2d 698, as supporting the proposition that a power company which failed to furnish adequate power for a customer's electric motor violated an implied duty "to furnish sufficient voltage" to reasonably take care of the use to which it knew the customer was going to make of the electric service. From that point it argues that a power company can be held liable for furnishing more than adequate power. But what is the standard? Plaintiff also cites Virginia Electric & Power Co. v. Carolina Peanut Co., 186 F. 2d 816, as follows: "While evidence of custom is pertinent on the question of negligence as tending to establish whether due care has been used under the circumstances of the case, it is not conclusive of the question, *which is one for the determination of the jury* where there is other evidence from which the jury could properly conclude that ordinary care

was not used. Custom cannot excuse the failure to use ordinary care." (Emphasis supplied.)

In Buttner v. Omaha P. P. Dist., 193 Neb. 515, 227 N. W. 2d 862 (1975), this court stated as follows: "The failure of plaintiffs to establish by a preponderance of the evidence the amount of current flowing from the downed conductor was fatal to their contentions. They failed to prove to the satisfaction of the trial court that a proximate cause of the fire was the absence of the fuse or the setting of the relays as the court may well have found from the evidence that the fire would have resulted even had the precautions plaintiffs advocated been taken. *Furthermore, the court could reasonably have found that the setting of the relays and the failure to fuse the tap were not in violation of industry standards and did not constitute negligence.*" (Emphasis supplied.)

Section 23-2406, R. R. S. 1943, provides that actions of this kind "shall be heard and determined by the appropriate court without a jury." Interpreting this section, this court in Buttner v. Omaha P. P. Dist., *supra,* stated: "As we have heretofore held: 'On an appeal to this court of an action under the State Tort Claims Act the findings of the trial court will not be disturbed unless clearly wrong.' (Citations omitted)."

Evidence of custom and usage in the electrical power industry is pertinent on the question of negligence and it, together with all other facts and circumstances of the case, presents a question for the determination of the trier of facts as to whether or not due care was used. That question having been determined by the trial court contrary to plaintiff's contention, and no error being apparent from an examination of the record, the judgment is affirmed.

AFFIRMED.